**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

IMHOTEP H'SHAKA, f/k/a COREY HEATH,[1]

Plaintiff,

- v -                                                         Civ. No. 9:03-CV-937
                                                              (LEK/RFT)

C. DROWN, Commissioner's Hearing Officer; R. MINOGUE,
Captain; J. CAREY, Captain; W. HUGHES, Correction Officer;
L. DUGUETTE,[2] Sergeant; R. GLASSCOCK,[3] Correction Officer;
J. MANOR, Correction Officer; G.S. GOORD, Commissioner;
J. MITCHELL, Nurse Administrator; T. EAGEN, Director of
C.O.R.C.; A. BRANCH, Registered Dietician; D. ARTUS, First
Deputy Superintendent; D. SENKOWSKI, Superintendent;
C. BRUCE, Correction Officer; R. WITKIEWICZ, Maintenance
Supervisor 3; D. LUCIA, Sergeant; J. MCCLOUD, Food Service
Administrator; K. LEE, Doctor; S. MILLER, Nurse Practitioner;
D. BUSHEY, Correction Officer; and M. GILLEN, Nurse,[4]

Defendants.

**APPEARANCES:**                                              **OF COUNSEL:**

IMHOTEP H'SHAKA
Plaintiff, *Pro Se*
91-A-6065
Auburn Correctional Facility
Box 618
Auburn, NY 13024

---

[1] On June 15, 2006, the Court received a letter from Plaintiff wherein he changed his name from Corey Heath to Imhotep H'Shaka.  *See* Dkt. Nos. 85 & 86.  Since this new name is also reflected within the Department of Correctional Services, the Court will refer to this Plaintiff by his changed name.

[2] Plaintiff mistakenly spells Defendant Duquette's name as "Duguette."  *See* Dkt. No. 97, Larry Duquette Aff., dated Aug. 28, 2006.  The Court will refer to this Defendant by the proper spelling.

[3] Plaintiff also mistakenly spells Defendant Glascock's name as "Glasscock."  *See* Dkt. No. 97, Rene Glascock Aff., dated Aug. 8, 2006.  The Court will refer to this Defendant by the proper spelling.

[4] Defendants Mitchell, Senkowski, and Bruce have not been served with the Complaint in this action and have not appeared in any capacity.

HON. ANDREW CUOMO                                  JEFFREY P. MANS, ESQ.
Attorney General for the State of New York         Assistant Attorney General
Attorney for Defendants Drown, Minogue, Carey
Hughes, Duquette, Glascock, Manor, Goord,
Eagen, Branch, Artus, Witkiewicz, Lucia, McCloud,
Lee, Miller, Bushey, and Gillen
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

### **REPORT-RECOMMENDATION and ORDER**

*Pro se* Plaintiff Imhotep H'Shaka brings a civil action, pursuant to 42 U.S.C. § 1983,

alleging that 1) Defendants Lee, Drown, Miller, McCloud, Branch, Gillen, Artus, Lucia,

Witkiewicz, Goord, and Eagen were deliberately indifferent towards his medical needs in violation

of the Eighth Amendment; 2) Defendant Minogue violated his Fourteenth Amendment due process

rights by not allowing him to object to the restricted diet imposed at his Hearing;[5] 3) Defendants

Manor, Bushey, Hughes, Glascock, Duquette, Minogue, and Carey retaliated against him in

violation of the First Amendment; and 4) Defendants Bushey, Hughes, Manor, Duquette, and Carey

conspired to violate his First Amendment rights in violation of 42 U.S.C. § 1985.[6]  Dkt. No. 1,

Compl. at § 6, Facts at ¶¶ 1-8, 10-14, 16-18, 21-23, 25-29, & 31-39 & § 7, First and Second Causes

---

[5] Though Plaintiff frames this alleged violation as occurring under the First Amendment, since Plaintiff is challenging the procedures of his Hearing, the proper allegation would fall under the Fourteenth Amendment as a due process violation.

[6] Although Plaintiff does not allege a conspiracy cause of action under the section in his Complaint for "Causes of Action," his statement of facts allege a conspiracy among certain Defendants.  *Compare* Dkt. No. 1, Compl. at § 7, Causes of Action *with* § 6, Facts at ¶¶ 28, 32, 34, & 38.  Therefore, the Court will liberally construe Plaintiff's Complaint as stating a cause of action for conspiracy as Defendants address this issue in their Memorandum of Law.  *See* Dkt. No. 97, Defs.' Mem. of Law at pp. 9-10.

of Action.  Defendants bring a Motion for Summary Judgment.  Dkt. No. 97.[7]  Plaintiff opposes the

Motion.  Dkt. No. 102.  For the reasons to follow, it is recommended that the Motion for Summary

Judgment be **granted**.

## I.  FACTS[8]

Plaintiff made prior claims that he was allergic to milk but no longer makes that claim.  Dkt.

No. 97, Defs.' 7.1 Statement at ¶ 2; Dkt. No. 97, Gerald Rock Aff., dated Aug. 29, 2006, Ex. B,

Pl.'s Dep. at p. 5, lines 7-12.  Diagnosis of a milk allergy is done through a radioallergosorbent

("RAST") test and most allergies pertain to the lactose in the milk, not the milk itself.  Defs.' 7.1

Statement at ¶¶ 3 & 4.  A milk allergy is different from being lactose intolerant in that a person is

not subject to serious bodily harm nor are there any long lasting or permanent effects.  *Id.* at ¶¶ 5-7.

There was no indication from any RAST test result that Plaintiff was allergic to milk in May 2002.

*Id.* at ¶ 8; Dkt. No. 102, Pl.'s 7.1 Statement at ¶ 8.  Furthermore, Plaintiff has refused, on several

occasions, to even take the test.  Defs.' 7.1 Statement at ¶ 9 & 37-38; Pl.'s 7.1 Statement at ¶ 9;[9]

Rock Aff., Ex. B, Pl.'s Dep. at p. 18, lines 7-19, & p. 19, lines 12-15; Dkt. No. 97, Paul Annetts

Aff., dated July 14, 2006, Ex. A, Mem., dated Feb. 2, 2001.  Dr. Lee has never diagnosed Plaintiff

---

[7] The Court is unsure as to whether Defendant Goord's name was inadvertently left off of the Notice of Motion since all other Defendants are listed.  Dkt. No. 97, Notice of Mot.  Nevertheless, Defendant Goord is discussed within the Memorandum of Law submitted by the Defendants and therefore, the Court will take that into consideration. *Compare* Notice of Mot. *with* Defs.' Mem. of Law.

[8] Although Plaintiff attempts to comply with Northern District of New York Local Rule 7.1(a)(3), he has failed to comply since he does not admit nor deny all of the movants' assertions.  Dkt. No. 102.  As such, any facts not specifically controverted by Plaintiff may be deemed admitted.  N.D.N.Y.L.R. 7.1(a)(3).  Nevertheless, this Court will utilize Plaintiff's Statement of Facts and accompanying Exhibits as well as Defendants' Statement of Material Facts with accompanying Exhibits to adduce the uncontested, material facts of the case.

[9] Plaintiff states he has taken the test once, but the results were lost.  Dkt. No. 102, Pl.'s 7.1 Statement at ¶¶ 8-9.

with a milk allergy.  Defs.' 7.1 Statement at ¶ 10.[10]  Nevertheless, Dr. Lee signed a Therapeutic Diet Order Form on June 15, 1999, indicating a milk allergy.  *Id.* at ¶¶ 11 & 12; Dkt. No. 97, Kang Lee Aff., dated July 7, 2006, Ex. B, Diet Order Form, dated June 15, 1999.  However, on June 29, 1999, the June 15th diet order was superceded by a new Therapeutic Diet Order Form which did not list the milk allergy.  Defs.' 7.1 Statement at ¶¶ 13 & 14; Lee Aff., Ex. C, Diet Order Form, dated June 29, 1999.

On April 21, 2002, while housed in the Special Housing Unit ("SHU"), Plaintiff was issued a Misbehavior Report ("Report") for alleged misconduct.  Defs.' 7.1 Statement at ¶¶ 15 & 16; Pl.'s 7.1 Statement at ¶ 15 & 16; Dkt. No. 97, Curtis Drown Aff., dated Aug. 1, 2006, Ex. A, Misbehavior Report, dated Apr. 21, 2002.  The Report alleged Plaintiff made sexually explicit comments to a female nurse and Plaintiff was charged with interference with an employee and verbal harassment.  Defs.' 7.1 Statement at ¶ 17; Pl.'s 7.1 Statement at ¶ 17.  A Tier III Hearing was conducted in May 2002 by Hearing Officer Drown and Plaintiff was found guilty of verbal harassment but not guilty of interference with an employee.  Defs.' 7.1 Statement at ¶¶ 18 & 19; Pl.'s 7.1 Statement at ¶ 18 & 19; Drown Aff., Ex. B, Hr'g Disposition.  At the time this Hearing was conducted, Plaintiff was in the midst of serving a thirty-six month disciplinary confinement penalty in SHU and had already lost certain privileges.  Defs.' 7.1 Statement at ¶¶ 20 & 21; Pl.'s 7.1 Statement at ¶¶ 20 & 21; *see* Rock Aff., Ex. A, Inmate Disciplinary History, Tier III Incident, dated Apr. 12, 1999.

---

[10] Although Plaintiff denies this statement by citing to Exhibit A of his Affidavit, the Exhibit only references that Plaintiff would participate in a special diet and does not pertain to a diagnosis or non-diagnosis of an allergy to milk.  Pl.'s 7.1 Statement at ¶ 10; Dkt. No. 102, Imhotep H'Shaka Aff., dated Jan. 4, 2007, at ¶ 2, Ex. A, Special Diet Form, dated June 29, 1999.

If an inmate is serving long term confinement in SHU and is found guilty of disciplinary violations, the inmate may be placed on a restricted diet. Defs.' 7.1 Statement at ¶ 22. Upon the conclusion of the May 2002 Hearing, Drown placed Plaintiff on a fourteen day restricted diet. *Id.* at ¶ 23; Pl.'s 7.1 Statement at ¶ 23; Drown Aff., Ex. B, Hr'g Disposition. As an administrative procedure, the Commissioner is informed of the restricted diet, although no authorization is needed from the Commissioner to impose the diet. Defs.' 7.1 Statement at ¶¶ 24 & 25; Pl.'s 7.1 Statement at ¶ 24. Notwithstanding, First Deputy Superintendent Artus reduced the restricted diet from fourteen to seven days. Defs.' 7.1 Statement at ¶ 26; Pl.'s 7.1 Statement at ¶ 26. The restricted diet, however, would not begin until medical staff determines whether an inmate should be placed on the diet. Defs.' 7.1 Statement at ¶¶ 27 & 28; Pl.'s 7.1 Statement at ¶ 27. Plaintiff was cleared for the restricted diet by Nurse Practitioner Miller, not Dr. Lee, though Nurse Miller discussed the situation with Dr. Lee and Dietician Arlene Branch. Defs.' 7.1 Statement at ¶¶ 29-33; Pl.'s 7.1 Statement at ¶¶ 29-33; Dkt. No. 97, Sheryl Miller Aff., dated July 14, 2006, Ex. B, Ambulatory Health Record ("AHR") entry, dated May 8, 2002. Neither Miller nor Branch was aware of any medical condition to prevent the restriction of Plaintiff's diet, though Plaintiff had told Miller he felt sick taking lactoid tablets. Defs.' 7.1 Statement at ¶¶ 34 & 39; Pl.'s 7.1 Statement at ¶ 34; Miller Aff., Ex. B, AHR entry, dated May 8, 2002. Branch had no authority to either impose or stop the use of a restricted diet for Plaintiff. Defs.' 7.1 Statement at ¶¶ 35 & 36.[11] Nurse Gillen was not involved in any decision regarding the restricted diet. *Id.* at ¶ 48.[12] Plaintiff was on the restricted diet from May

---

[11] Plaintiff denies the statement regarding Branch's authority based on the fact that she discussed with medical staff that the restricted diet loaf contained powdered milk. Pl.'s 7.1 Statement at ¶¶ 35 & 36.

[12] Plaintiff denies this statement by generally stating that all nurses have a duty to ensure that Plaintiff's diet was not contraindicated. Pl.'s 7.1 Statement at ¶ 48.

8 until May 15, 2002.  Miller Aff. at ¶ 16.

The restricted diet consisted of a diet loaf, which is nutritionally adequate, generally contains milk and is more digestible for someone suffering from lactose intolerance once baked.  *Id.* at ¶¶ 40 & 41.[13]  The recipe could be modified for lactose intolerant inmates and not made with any fluid milk.  *Id.* at ¶¶ 42 & 43.[14]  John McCloud, as the Food Services Administrator, consulted with medical staff on the restricted diet and discussed the loaf.  *Id.* at ¶ 46.  McCloud had no reason to believe Plaintiff could not be placed on the restricted diet nor was it part of his duties to allow or disallow the diet.  *Id.* at ¶¶ 45 & 47.

After the restricted diet is in place, Department of Correctional Services policy requires that inmates be evaluated by the medical staff on a regular basis and Plaintiff was so evaluated.  *Id.* at ¶¶ 49 & 50; Pl.'s 7.1 Statement at ¶¶ 49 & 50.  Nurse Gillen examined Plaintiff twice during the time of the restricted diet.  Defs.' 7.1 Statement at ¶ 51; Pl.'s 7.1 Statement at ¶ 51.  On May 12, 2002, Plaintiff complained about the diet because he claimed he was lactose intolerant, but he did not complain about any medical conditions.  Defs.' 7.1 Statement at ¶¶ 53 & 54; Miller Aff., Ex. B, AHR entry, dated May 12, 2002.  Nurse Gillen referred his complaint to Nurse Miller, who saw Plaintiff on May 13, 2002.  Defs.' 7.1 Statement at ¶¶ 55 & 56; Pl.'s 7.1 Statement at ¶ 56; Miller Aff., Ex. B, AHR entry, dated May 13, 2002.  Miller observed Plaintiff for six of the days he was on the restricted diet and noted he was in good physical condition and had no medical problems, though Plaintiff kept expressing his displeasure with the diet.  Defs.' 7.1 Statement at ¶¶ 57 & 58;

---

[13] Plaintiff denies this statement saying that he cannot eat cakes, waffles, cookies, etc., and those items are baked.  Pl.'s 7.1 Statement at ¶ 40.

[14] Plaintiff also denies this statement as the Director of Nutritional Services stated in a letter, dated February 16, 2005, that the lactose free loaf was created in 2003.  Pl.'s 7.1 Statement at ¶ 42-44; Dkt. No. 102, Imhotep H'Shaka Aff., dated Jan. 4, 2007, Ex. E, Dean Lt., dated Feb. 16, 2005.

Pl.'s 7.1 Statement at ¶ 57; *see* Miller Aff., Ex. B, AHR entries.  On May 15, 2002, Plaintiff stated

to Miller that he was feeling dizzy and weak.  Defs.' 7.1 Statement at ¶ 59; Pl.'s 7.1 Statement at ¶

59.  Miller then directed Plaintiff be brought to the facility hospital for evaluation.  Defs.' 7.1

Statement at ¶ 59; Pl.'s 7.1 Statement at ¶ 59.  Miller conducted her own physical evaluation on

Plaintiff.  Defs.' 7.1 Statement at ¶ 60; Pl.'s 7.1 Statement at ¶ 60.  Plaintiff also underwent a

glucoscan, chemstik, and urine analysis, all of which showed Plaintiff was in no medical distress.

Defs.' 7.1 Statement at ¶¶ 61 & 62; Pl.'s 7.1 Statement at ¶¶ 61 & 62.

On May 24, 2002,[15] Plaintiff filed a grievance challenging the imposition of the restricted

diet.  *Id.* at ¶ 65; Dkt. No. 97, David Lucia Aff., dated July 26, 2006, Ex. A, Grievance, dated May

24, 2002.  Plaintiff was no longer on the restricted diet when the grievance was filed.  Defs.' 7.1

Statement at ¶¶ 66 & 79; Pl.'s 7.1 Statement at ¶ 79.[16]  Neither Sergeant Lucia nor Maintenance

Supervisor Witkiewicz were aware of Plaintiff's restrictive diet prior to the filing of the grievance.

Defs.' 7.1 Statement at ¶¶ 68 & 69.  Both served on the Inmate Grievance Resolution Committee

("IGRC") that considered Plaintiff's grievance.  *Id.* at ¶ 70; Pl.'s 7.1 Statement at ¶ 70.  An

investigation was conducted, in which the medical staff was consulted, and the investigation

revealed no evidence of an allergy to milk nor was there any medical reason why Plaintiff could not

be placed on a restricted diet.  Defs.' 7.1 Statement at ¶¶ 71-74; Pl.'s 7.1 Statement at ¶¶ 71 & 72.

Neither Lucia nor Witkiewicz had any advanced medical training nor did they have the authority to

---

[15] Although Defendants' 7.1 Statement gives a date of May 23, 2002, for the filing of the grievance, the actual grievance provides a date of May 24, 2002.  *Compare* Defs.' 7.1 Statement at ¶ 65 *with* Dkt. No. 97, David Lucia Aff., dated July 26, 2006, Ex. A, Grievance, dated May 24, 2002.

[16] Plaintiff denies this statement claiming he filed a grievance on May 7, 2002.  Pl.'s 7.1 Statement at ¶¶ 65 & 66.  However, a copy of the May 7th grievance was not provided, though Plaintiff claims the grievance was destroyed by facility staff.  *Id.* at ¶ 65.

suspend or stop the restricted diet. Defs.' 7.1 Statement at ¶¶ 75-78. After the investigation, the matter was appealed to the Superintendent. *Id.* at ¶ 80; Pl.'s 7.1 Statement at ¶ 80. Artus investigated the grievance on behalf of the Superintendent regarding the restricted diet. Defs.' 7.1 Statement at ¶¶ 81-83; Pl.'s 7.1 Statement at ¶ 81. Artus was told by medical staff that there was no reason Plaintiff could not be placed on the restricted diet and relying on that information, since Artus did not himself have any medical training, the grievance was denied. Defs.' 7.1 Statement at ¶¶ 84-86. Plaintiff appealed the decision to the Central Office Review Committee ("CORC"), which is comprised of Deputy Commissioners or their designees. *Id.* at ¶¶ 87 & 88; Pl.'s 7.1 Statement at ¶¶ 87 & 88. The CORC found that Plaintiff was seen by the nurse practitioner before the diet began and then daily thereafter. Dkt. No. 97, Dale Artus Aff., dated Aug. 14, 2006, Ex. F, CORC Review, dated July 31, 2002. It was further noted that there was no indication in Plaintiff's medical records that he was allergic to milk and that the restricted diet would not affect an inmate who was lactose intolerant. *Id.* Thomas Eagen, who signed off on the CORC's decision, is a non-voting member of the CORC and does not vote on the outcome of grievances, which included Plaintiff's grievance. Defs.' 7.1 Statement at ¶¶ 89-90 & 92; Pl.'s 7.1 Statement at ¶ 89. Eagen signs the CORC determinations to verify that it was a CORC decision and ensures implementation of such. Defs.' 7.1 Statement at ¶ 91; Pl.'s 7.1 Statement at ¶ 91; Dkt. No. 97, Thomas Eagen Aff., dated July 26, 2006, Ex. A, Directive No. 4040, § 701.5(d)(2)(iii).

On September 13, 2002, a Therapeutic Diet Request Form was filled out for Plaintiff which did not indicate a milk allergy. Defs.' 7.1 Statement at ¶ 63. Subsequently, in October 2002, Plaintiff refused the RAST test but did not sign the refusal form. *Id.* at ¶ 64; Miller Aff., Ex. E, Refusal Form, dated Oct. 10, 2002.

-8-

DOCS policy mandates that a certain number of cells be randomly searched within a facility and within Clinton, two cells in SHU are randomly searched each day.  Defs.' 7.1 Statement at ¶¶ 93 & 94; Pl.'s 7.1 Statement at ¶ 93; Dkt. No. 97, Jeff Tedford Aff., dated Aug. 9, 2006, Ex. A, DOCS Policy No. 4910.  Thirty-six cells are present in SHU and each cell holds one inmate.  Defs.' 7.1 Statement at ¶ 95; Pl.'s 7.1 Statement at ¶ 95.  One of the two cells to be searched at Clinton is selected by a computer and then the administrative staff selects another cell using a list of cells. Defs.' 7.1 Statement at ¶¶ 96 & 97; Pl.'s 7.1 Statement at ¶ 96.  The cell number chosen manually is crossed off the list and not selected again until all cells have been searched.  Defs.' 7.1 Statement at ¶ 98; Tedford Aff., Ex. A, DOCS Policy No. 4910, § V(A)(2).  The number of the cell manually chosen is written on the cell search authorization form next to the computer chosen cell number.  *Id.* at ¶ 99.  Cells in SHU are generally searched at least twice a month.  *Id.* at ¶ 100.

On December 2, 2002, Plaintiff filed a grievance against Manor regarding recreation and medication, which was found to be without merit.  *Id.* at ¶ 101; Dkt. No. 97, Jay Manor Aff., dated Aug. 28, 2006, at ¶ 7, Ex. A, CORC Review, dated Feb. 4, 2003.[17]  Subsequently, on December 9, 2002, Plaintiff's cell was manually selected to be searched and Officer Manor conducted such a search as directed by the Captain's Office.  Defs.' 7.1 Statement at ¶¶ 102 & 103; Pl.'s 7.1 Statement at ¶ 102.  During the search, contraband was found in Plaintiff's cell, which is a violation of prison rules.  Defs.' 7.1 Statement at ¶¶ 105 & 106; Pl.'s 7.1 Statement at ¶ 106; Manor Aff., Ex. C, Cell Search Slip, dated Dec. 9, 2002.  Since contraband was found in Plaintiff's cell, Manor issued a Misbehavior Report.  *Id.* at ¶¶ 107 & 108; Dkt. No. 97, Robert Minogue Aff., dated August 25, 2006, Ex. A, Misbehavior Report, dated Dec. 9, 2002.  A Hearing was conducted on January 2,

---

[17] A copy of the grievance was not provided.

2003,[18] by Captain Minogue.  Defs.' 7.1 Statement at ¶¶ 112, & 113; Rock Aff., Ex. A, Inmate

Disciplinary History, Tier III Incident, dated Dec. 9, 2002; Minogue Aff., Ex. B, Hr'g Tr., dated Jan.

2, 2003, at pp. 39-41.  Prior to entering the disposition of the Hearing, Plaintiff was asked if he had

any procedural objections to which he stated there were none.  Minogue Aff., Ex. B, Hr'g Tr. at p.

39.  After a brief recess while Minogue considered the testimony, Minogue continued with the

Hearing and found Plaintiff guilty of the rule violations.  Defs.' 7.1 Statement at ¶ 109; Pl.'s 7.1

Statement at ¶ 109; Minogue Aff., Ex. B, Hr'g Tr., dated Jan. 2, 2003, at pp. 39-41.  As the penalty,

Minogue placed Plaintiff on a restricted diet.  Defs.' 7.1 Statement at ¶ 114; Pl.'s 7.1 Statement at ¶

114; Minogue Aff., Ex. B, Hr'g Tr. at pp. 39-40.  After the disposition was read into the record,

Plaintiff attempted to place an objection on the record as to the reasons for the disposition.

Minogue Aff., Ex. B, Hr'g Tr. at p. 40.  Minogue told Plaintiff that those reasons should be reserved

for the appeal since they concerned the disposition of the matter.  *Id.*  Minogue then stated the

manner in which Plaintiff could appeal.  *Id.* at pp. 40-41.  Plaintiff appealed Minogue's

determination raising the issue of the restricted diet, and the decision was affirmed on appeal.

Defs.' 7.1 Statement at ¶¶ 109 & 114; Pl.'s 7.1 Statement at ¶¶ 109 & 114; Minogue Aff., Exs. C.,

Pl.'s Appeal, dated Jan. 16, 2003, & D, Review of Hr'g, dated Feb. 28, 2003.

On December 28, 2002, Plaintiff's cell was randomly chosen by the computer to be searched

and Corrections Officers Bushey and Hughes conducted the search, which was authorized by

Captain Carey.  Defs.' 7.1 Statement at ¶¶ 116 & 117; Pl.'s 7.1 Statement at ¶¶ 116 & 117; Dkt. No.

97, D. Bushey Aff., dated Aug. 8, 2006, Ex. A, Cell Search Form, dated Dec. 28, 2002, & Wendell

---

[18] The Hearing actually began on December 19, 2002, and was adjourned on several occasions.  *See* Dkt. No. 97, Robert Minogue Aff., dated August 25, 2006, Ex. B, Hr'g Tr., dated Jan. 2, 2003.  January 2, 2003 is the date the disposition of the Hearing was rendered.  *Id.* at pp. 29-41.

Hughes Aff., dated Aug. 28, 2006, Ex. A, Cell Search Form, dated Dec. 28, 2002.  At the time of the search, Hughes stated he was not aware of any grievance filed against Manor and Manor claims he did not tell either Bushey or Hughes to retaliate against Plaintiff or place contraband in his cell. Defs.' 7.1 Statement at ¶¶ 118-20 & 122-23.[19]  During the search of Plaintiff's cell, contraband was found, which included two broken pieces of mirror, three frisking gloves, matches, rolling papers, and tobacco.  *Id.* at ¶¶ 125-27; Bushey Aff., Ex. B, Cell Search Slip, dated Dec. 28, 2002.  A Misbehavior Report was issued as a result.  Defs.' 7.1 Statement at ¶ 128; Bushey Aff., Ex. C, Misbehavior Report, dated Dec. 28, 2002.

On January 1, 2003, Plaintiff's cell was randomly chosen by the computer to be searched and Corrections Officer Glascock conducted the search, which was authorized by Captain Carey. *Id.* at ¶¶ 129-30 & 134; Pl.'s 7.1 Statement at ¶¶ 130 & 134; Dkt. No. 97, Rene Glascock Aff., dated Aug. 8, 2006, Ex. A, Cell Search Form, dated Jan. 1, 2003.  As a result of the search, no contraband was found in Plaintiff's cell and no Report was issued.  Defs.' 7.1 Statement at ¶¶ 136 & 137; Pl.'s 7.1 Statement at ¶¶ 136 & 137.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  The moving party bears the burden to demonstrate through "pleadings, depositions, answers

---

[19] Plaintiff denies these statements based upon an Affidavit of another inmate, however, as Plaintiff makes the claim for retaliation in that grievances were filed before the search and that contraband was placed in his cell, Defendants' statements are included to better understand the nature of the claim.  *See* Pl.'s 7.1 Statement at ¶¶ 118-20 & 122-23; H'Shaka Aff., Ex. G, Mark Lawler Aff., dated Dec. 31, 2002.

to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary

judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

### B.  Eighth Amendment Claim

Plaintiff alleges deliberate indifference towards his medical needs as a result of his supposed milk allergy when: 1) Lee approved the restricted diet despite the claimed allergy; 2) Drown, after a Hearing, restricted Plaintiff's diet which included a diet loaf containing milk or milk products; 3) Miller medically approved the restricted diet despite the alleged allergy and failed to give Plaintiff lactoid tablets, which Plaintiff claims previously caused a violent reaction; 4) McCloud informed Miller that the restricted diet only contained dry milk; 5) Branch approved the restricted diet because the loaf only contained powdered milk; 6) Gillen checked Plaintiff's medical records but did not remove him from the restricted diet; 7) Artus allowed Plaintiff to remain on the restricted diet and did not conduct an investigation of Plaintiff's medical condition; 8) Lucia and Witkiewicz did not grant Plaintiff's grievance to stop the restricted diet; 9) Goord did not investigate Plaintiff's medical issues and allowed Plaintiff to be placed on the restricted diet; and 10) Eagen signed off on the CORC's decision that there was no indication Plaintiff had a milk allergy and allowed for the restricted diet.  Compl. at ¶¶ 1-8, 10-14, & 16-18; Dkt. No. 102, Pl.'s Mem. of Law at pp. 2-6. Plaintiff claims the seven-day restricted diet caused weight loss, headaches, dizziness, and stomach pains.  Compl. at ¶ 21; Pl.'s Mem. of Law at p. 6.  Defendants Lee, Drown, Miller, McCloud, Branch, Gillen, Artus, Lucia, Witkiewicz, Goord, and Eagen state Plaintiff has failed to establish an Eighth Amendment violation.  Dkt. No. 97, Defs.' Mem. of Law at pp. 4-8.

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance v. Armstrong*, 143 F.3d at 702 & *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). The subjective element "entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin*, 99 F.3d at 553 (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)).

This deliberate indifference must be in regards to the "prisoner's serious illness or injury[.]" *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Additionally, "'[b]ecause society does not expect that prisoners will have unqualified access to health care,' a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care." *Smith v. Carpenter*, 316 F.3d at 184 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)) (further citation omitted). Some factors that determine whether a prisoner's medical condition is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical

condition significantly affects daily activities, and 3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one").

The prisoner has to show "more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability." *Smith v. Carpenter*, 316 F.3d at 184 (internal quotation marks and citation omitted). Prison officials act with deliberate indifference "when [they] 'know[] of and disregard[] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.'" *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. at 837). The Eighth Amendment deals with "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract[.]" *Smith*, 316 F.3d at 186 (citations omitted). Moreover, the "severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Id.* at 187 (citation omitted).

Here, Plaintiff must make a threshold showing that he suffers from a serious illness. Plaintiff claims that a milk allergy constitutes a serious medical condition because if he should drink milk, his throat would swell and he would not be able to breathe. Pl.'s Mem. of Law at p. 6. Nevertheless, it has been held that an allergy to milk is not a sufficiently serious medical condition. *See Porter v. Coombe*, 1999 WL 587896, at *3 (S.D.N.Y. Aug. 4, 1999). In any event, Plaintiff

*-15-*

admits he is not allergic to milk because it has not "been established whether it's an allergy or intolerance." Rock Aff., Ex. B, Pl.'s Dep. at p. 5, lines 7-12. Dr. Lee never diagnosed Plaintiff with a milk allergy and Plaintiff, on several occasions, refused to take the RAST test to determine whether there was an allergy. Defs.' 7.1 Statement at ¶¶ 8-9 & 37-38; Rock Aff., Ex. B, Pl.'s Dep. at p. 18, lines 7-19, & p. 19, lines 12-15; Annetts Aff., Ex. A, Mem., dated Feb. 2, 2001; Lee Aff. at ¶¶ 5-15. As such, Plaintiff has failed to establish he has a serious illness.

Moreover, it has been held that placement on a restricted diet does not constitute an Eighth Amendment violation. *See Smith v. Burge*, 2006 WL 2805242, at * 11 n. 78 (N.D.N.Y. Sept. 28, 2006) (citing *McEachin v. McGuinnis,* 357 F.3d 197, 199-201 (2d Cir. 2004) for the proposition that the court properly dismissed the Eighth Amendment claim where the inmate alleged he was placed on a restricted diet of a loaf for seven days; *Johnson v. Gummerson,* 98-CV-0004, Mem.-Decision & Order (N.D.N.Y.), *aff'd,* 198 F.3d 233 (2d Cir. 1999) (unpublished opinion) (stating there was no Eighth Amendment violation where inmate was placed on restricted diet for seven days); *Dumpson v. Rourke,* 1997 WL 610652, at *2 & 7-8 (N.D.N.Y. Sept. 26, 1997) (finding no Eighth Amendment violation where the inmate was placed on restricted diet for seven days); & *Porter v. Coombe,* 1999 WL 587896, at *1, 3 & n.2 (holding there was no Eighth Amendment violation when the inmate was placed on restricted diet even though the plaintiff was allergic to two of the ingredients in the restricted diet loaf)) (further citations omitted). Here, Plaintiff's restricted diet was reduced from fourteen to seven days and there was no complaint that the loaf given was not nutritionally adequate, only that he had problems with milk. Artus Aff. at ¶¶ 8-14. However, as noted above, there was no evidence to show that Plaintiff had any problems with milk and thus, there was no medical reason that the restricted diet could not to be imposed.

Even if Plaintiff could meet his burden that a milk allergy is a serious illness, Plaintiff cannot show that Defendants Lee, Drown, Miller, McCloud, Branch, Gillen, Artus, Lucia, Witkiewicz, Goord, or Eagen knew of and disregarded an excessive risk to Plaintiff's health.  Lee, Drown, Miller, Gillen, Artus, Lucia, and Witkiewicz all consulted with medical staff before Plaintiff was placed on the restricted diet consisting of the loaf.  *See* Lee Aff. at ¶¶ 4-15; Drown Aff. at ¶¶ 6-15; Miller Aff. at ¶¶ 4-15; Dkt. No. 97, Mary Beth Gillen Aff., dated July 10, 2006, at ¶¶ 4-11; Artus Aff. at ¶¶ 10-13; Lucia Aff. at ¶¶ 6-10; Dkt. No. 97, Robert Witkiewicz Aff., dated July 19, 2006, at ¶¶ 6-11.  McCloud and Branch had nothing to do with placing Plaintiff on a restricted diet and merely gave their opinion as to what the loaf contained and its nutritional value.  Dkt. No. 97, John McCloud Aff., dated Aug. 9, 2006, at ¶¶ 2-7; Dkt. No. 97, Arlene Branch Aff., dated Aug. 11, 2006, at ¶¶ 3-10.  Eagen only signed off on the CORC decision, which indicated that medical staff were contacted, and did not have any involvement in allowing the diet to go forward.  Eagen Aff. at ¶¶ 11 & 12, Ex. B, CORC Review, dated July 31, 2002.  Goord played no part in the decision.  Artus Aff. at ¶ 7.  Thus, there is no indication that any of the Defendants purposefully disregarded Plaintiff's alleged allergy to milk.

Based upon the foregoing, it is recommended that the Motion for Summary Judgment be **granted** on the Eighth Amendment claim.

### C.  Fourteenth Amendment Claim

Plaintiff claims that Defendant Minogue violated his due process rights by not allowing him to object to the restricted diet imposed at his Disciplinary Hearing.  Compl. at ¶ 35.  Defendant Minogue states that Plaintiff was told of his opportunity to appeal the decision regarding the restricted diet, which would constitute an objection.  Defs.' Mem. of Law at pp. 10-12.

The Fourteenth Amendment to the Constitution states that "no State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[] the sentence in . . . an unexpected manner[.]" *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 37 F. Supp. 2d 162, 167 (N.D.N.Y.), *vacated and remanded on other grounds by* 238 F.3d 223 (2d Cir. 2001) (citing *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996)). In *Sandin*, the Supreme Court ruled that the Constitution did not require that restrictive confinement within a prison be preceded by procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship . . . in relation to the ordinary incidents of prisoner life." 515 U.S. at 484; *see also Giano v. Selsky*, 238 F.3d at 225 (citing *Sandin v. Conner*, 515 U.S. at 484); *Welch v. Bartlett*, 196 F.3d 389, 392 (2d Cir. 1999). Thus, a prisoner asserting that he was denied due process in connection with segregated confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed such an "atypical and significant hardship." *See Sandin v. Conner*, 515 U.S. at 484.

Factors relevant to an analysis of what constitutes an atypical and significant hardship include: "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon*, 1998 WL 167297, at *5 (N.D.N.Y. Apr. 3, 1998) (citing *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir.

1998)); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical" (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999) (citations omitted). However, "[w]here the plaintiff was confined for an intermediate duration-- between 101 and 305 days–'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards*, 364 F.3d at 64-65 (quoting *Colon v. Howard*, 215 F.3d 227, 232 (2d Cir. 2000)); *see also Hanrahan v. Doling*, 331 F.3d 93, 97-98 (2d Cir. 2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement may not implicate a constitutionally protected liberty interest."); *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000) (noting that segregative sentences of 125-288 days are "relatively long" and therefore necessitate "specific articulation of . . . factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards*, 364 F.3d at 65 (citations omitted); *see also Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998); *Brooks v. DiFasi*, 112 F.3d 46, 49 (2d Cir. 1997).[20] If the conditions of confinement are undisputed, a court may decide the

---

[20] Department of Correctional Services policies provide the conditions of confinement prisoners are subject to when confined in SHU. *See* N.Y. COMP. CODES R. & REGS. tit. 7, §§ 304.1-.14 & 305.1-.6.

*Sandin* issue as a matter of law.  *Palmer v. Richards*, 364 F.3d at 65.  If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin*.  *Id.*

Here, Plaintiff must make the threshold showing of an atypical and significant hardship since a claim of denial of due process was asserted.  Plaintiff was already confined within SHU for a prior offense and the only penalty imposed from the January 2, 2003 Hearing conducted by Minogue was that Plaintiff would receive a restricted diet for fourteen days, with seven of those days suspended. Robert Minogue Aff., Ex. B, Hr'g Tr. at p. 39.  Thus, Plaintiff's diet was only restricted for seven days.  *Id.*  Because Plaintiff was already serving a long term disciplinary sentence and his privileges were revoked for the same period of his SHU confinement, DOCS policy permits inmates to be placed on a restricted diet for a certain period of time since it is an alternative disciplinary sanction available when an inmate violates a facility rule.  *See* Drown Aff. at ¶¶ 7 & 8; Rock Aff., Ex. A, Inmate Disciplinary History, Tier III Incident, dated Apr. 12, 1999.  Nevertheless and despite these facts presented, Plaintiff makes no claim that the restricted diet caused an atypical and significant hardship.  *See* Pl.'s Mem. of Law at pp. 8-9.  Thus, Plaintiff has failed to meet his threshold burden.

Even if Plaintiff could establish an atypical and significant hardship as a result of the restricted diet, Plaintiff's claim would still fail.  In affording due process, "an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken."  *Sira v. Morton*, 380 F.3d at 69 (citing *Wolff v. McDonnell*, 418 U.S.

563-67)) (further citations omitted).  However, "[t]hese procedures, of course, must in certain

circumstances give way to institutional safety or correctional goals."  *Young v. Hoffman*, 970 F.2d

1154, 1156 (2d Cir.), *cert. denied*, 510 U.S. 837 (1993)  (citation omitted); *Richardson v. Van*

*Dusen*, 833 F. Supp. 146, 152 (N.D.N.Y. 1993).

Here, Plaintiff does not claim a denial of any of the above due process rights.  *See* Compl. at

¶ 35.  He merely states he was not given an opportunity to object to the disposition.  *Id.*  However,

that is not the case.  Plaintiff attempted to place an objection on the record as to the reasons for the

disposition but Minogue told Plaintiff that those reasons should be reserved for the appeal since they

concerned the disposition of the matter.  Minogue Aff., Ex. B, Hr'g Tr. at p. 40.  Plaintiff did in fact

appeal Minogue's determination raising the issue of the restricted diet.  Minogue Aff., Ex. C., Pl.'s

Appeal, dated Jan. 16, 2003; *see supra* p. 10.  Thus, Plaintiff received his opportunity and was

afforded due process.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** on the

Fourteenth Amendment claim.

### D.  First Amendment Claim

Plaintiff alleges that: 1) after filing his December 2, 2002 grievance, Manor retaliated against

him by searching his cell on December 9, 2002, and issuing a Misbehavior Report; 2) Manor

retaliated against Plaintiff for his December 18, 2002 grievance by telling Bushey and Hughes to

search his cell and plant contraband on December 28, 2002; 3) Bushey and Hughes retaliated against

Plaintiff by issuing a false Misbehavior Report based on the December 28th search; 4) Glascock

retaliated against Plaintiff by searching his cell on January 1, 2003, after Plaintiff informed the

Superintendent on December 31, 2002, that he was experiencing retaliation; 5) on January 2, 2003,

Duquette told Plaintiff that the searches would continue as long as he filed grievances; and 6) Carey retaliated against Plaintiff by forging a memorandum allowing his staff to search Plaintiff's cell on December 9, 2002, when the memo actually gave permission for the search on December 8, 2002. Compl. at ¶¶ 22-23, 25-27, 29, 31, & 36-37.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) & *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988)).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citations omitted).  There must also be a "causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citation omitted).

A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord*, 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia*, the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary

charges on appeal as unfounded).  From other factors, we can infer an improper or retaliatory motive

such as the inmate's prior good disciplinary record, vindication at a hearing on the matter, and

statements by the defendant regarding his motive for disciplining plaintiff.  *McEachin v. Selsky*,

2005 WL 2128851, at *5 (N.D.N.Y. August 30, 2005) (citing *Colon v. Coughlin*, 58 F.3d 865, 872-

73 (2d Cir. 1995)).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse

action' *objectively*, as retaliatory conduct 'that would deter a similarly situated individual of

ordinary firmness from exercising . . . constitutional rights.'"  *Gill v. Pidlypchak*, 389 F.3d at 381

(quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (emphasis in original).  This objective

test will apply even though a particular plaintiff was not himself deterred.  *Id.*  If the plaintiff can

carry that burden, the defendants will still be entitled to summary judgment if they can show, by a

preponderance of the evidence, that they would have taken the same action in the absence of the

prisoner's First Amendment activity.  *Davidson v. Chestnut*, 193 F.3d 144, 148-49 (2d Cir. 1999);

*see Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998); *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d

Cir. 1994).

The Supreme Court has noted that the right to petition government for redress of grievances

is "among the most precious of the liberties safeguarded by the Bill of Rights."  *See United Mine*

*Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967).  The Second Circuit

has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access . .

. to both *administrative and judicial* forums for the purpose of seeking redress of grievances against

state officers.'"  *Franco v. Kelly*, 854 F.2d at 589 (quoting *Haymes v. Montanye*, 547 F.2d 188, 191

(2d Cir. 1976)) (emphasis and alterations in original).

## 1.  Defendants Manor, Bushey, and Hughes

Plaintiff alleges that Manor retaliated against him for filing his December 2, 2002 grievance when Manor searched his cell on December 9, 2002 and issued a Misbehavior Report.  Plaintiff further alleges retaliation when after filing his December 18, 2002 grievance, Manor told Bushey and Hughes to search his cell again and plant contraband; such search was conducted on December 28, 2002.  Plaintiff also states that Bushey and Hughes retaliated by issuing a Misbehavior Report after the December 28th search.  While we readily concede that the filing of the grievance is a protected activity, thus fulfilling the first burden, Plaintiff's claim must nevertheless fail.

In regards to the December 9th search, although the proximity of the filing of the grievance and the search is relatively close, Plaintiff cannot show a causal connection.  Manor Aff. at ¶¶ 7 & 8, Ex. A, CORC Review, dated Feb. 4, 2003.  As noted previously, DOCS policy mandates that a certain number of cells be randomly searched and within Clinton two cells in SHU are randomly searched each day.  Tedford Aff. at ¶¶ 4, 6 & 7, Ex. A, DOCS Policy No. 4910.  One of the two cells to be searched at Clinton is selected by a computer and then the administrative staff selects another cell using a list of cells.  *Id.* at ¶ 7.  With the December 9th search, Manor searched Plaintiff's cell as a result of the daily random search as directed by the Captain's Office.  Manor Aff. at ¶ 10, Ex. B, Cell Search Slip, dated Dec. 9, 2002.  One cell was randomly chosen and Plaintiff's cell was manually written down.  *Id.*  There is no evidence presented in the record to show that Plaintiff's cell number was chosen in order to retaliate against him.  Furthermore, the cell search would not be considered an adverse action as the inmates in SHU are well aware that random searches of their cells are conducted daily, thus, a search would not deter similarly situated inmates from exercising their constitutional rights.  *See Salahuddin v. Mead*, 2002 WL 1968329, *5-6

(S.D.N.Y. Aug. 26, 2002) (dismissing the inmate's First Amendment retaliation claim based on cell searches and holding that the inmate did not suffer any adverse action) (cited in *Lashley v. Wakefield*, 367 F. Supp. 2d 461, 470 (W.D.N.Y. 2005)).  Moreover, the Supreme Court has held that "inmates have no constitutional protection from cell searches, even those conducted for retaliatory reasons." *Hudson v. Palmer*, 468 U.S. 517, 530 (1984) (quoted in *Lashley v. Wakefield*, 367 F. Supp. 2d at 470 & further citing *Walker v. Keyser*, 2001 WL 1160588, *9 (S.D.N.Y. Oct. 17, 2001); *Moncrieffe v. Witbeck*, 2000 WL 949457, *6 (N.D.N.Y. Jun. 29, 2000); & *Higgins v. Coombe*, 1997 WL 328623, *7 (S.D.N.Y. Jun. 16, 1997)).

As for the Misbehavior Report issued by Manor after the December 9th search, the Second Circuit has held that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)); *see Batista v. Goord*, 2005 WL 2179420, at *11 n.75 (N.D.N.Y. Aug. 28, 2005); *Pittman v. Forte*, 2002 WL 31309183, at *5 (N.D.N.Y. July 11, 2002).  Furthermore, if a prisoner is afforded the opportunity to have a hearing, "the filing of unfounded charges does not give rise to a *per se* constitutional violation actionable under § 1983." *Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1988) (quoting *Freeman v. Rideout*, 808 F.2d at 953).  In addition, "[t]here must be more such as retaliation against the prisoner for exercising a constitutional right." *Pittman v. Forte*, 2002 WL 31309183, at *5 (citing *Franco v. Kelly*, 854 F.2d at 588-590); *see also Boddie v. Schnieder,* 105 F.3d at 862; *Batista v. Goord*, 2005 WL 2179420, at *11 n.75.

Here, Plaintiff alleges that Manor issued a false misbehavior report on December 9, 2002. However, Plaintiff has no constitutional right to be free from false accusations in a misbehavior

report.  Moreover, Plaintiff was afforded an opportunity to have a hearing based upon the report.

Minogue Aff., Ex. B, Hr'g Tr.  Even though a claim of retaliation is alleged, Manor states that the

same action, the issuance of the Report, would have been taken regardless of the grievance filed

because the possession of contraband was found in the cell which is a violation of prison rules and

thus, the issuance of the Report was mandated.  Defs.' Mem. of Law at p. 20; Manor Aff. at ¶¶ 12-

16, Exs. C, Cell Search Slip, dated Dec. 9, 2002, & D, Misbehavior Report, dated Dec. 9, 2002.

As for the December 18th grievance referenced by Plaintiff, which Plaintiff claims was the

cause of Manor retaliating against him with the December 28th cell search, there is absolutely no

evidence presented that Plaintiff actually did file a grievance on December 18th since neither

Plaintiff nor Defendants provided the Court with a copy of said grievance.  In any event, a search

was conducted on December 28, 2002.  Bushey Aff., Ex. A, Cell Search Form, dated Dec. 28, 2002,

& Hughes Aff., Ex. A, Cell Search Form, dated Dec. 28, 2002.  Although there is relative proximity

between the two events, there is no casual connection.  For the December 28th search, Plaintiff's cell

was randomly chosen by the computer and not picked by Manor.  Bushey Aff., Ex. A, Cell Search

Form, dated Dec. 28, 2002, & Hughes Aff., Ex. A, Cell Search Form, dated Dec. 28, 2002.

Furthermore, the search was authorized by Carey, not Manor.  Defs.' 7.1 Statement at ¶¶ 116 & 117;

Hughes Aff. at ¶ 8; Bushey Aff. at ¶ 7.  Moreover, as noted previously, Plaintiff has no

constitutional protection from a cell search, even if the search is conducted for a retaliatory reason.

*See Hudson v. Palmer*, 468 U.S. at 530.

As for the claim that the Misbehavior Report issued by Bushey and Hughes on December 28,

2002, was done for retaliation purposes, the claim cannot stand.  As noted previously, there is no

"general constitutional right to be free from being falsely accused in a misbehavior report."  *Boddie*

*v. Schnieder*, 105 F.3d at 862. The Court is unaware of whether a hearing took place after the Report was issued since the parties did not provide that information. Notwithstanding, Defendants state that Plaintiff was found with two broken pieces of mirror, three frisking gloves, matches, rolling papers, and tobacco, and thus, they would have issued the Report regardless of the grievance filed because contraband was found in Plaintiff's cell and it was a violation of prison rules. Bushey Aff. at ¶¶ 8-10; Hughes Aff. at ¶¶ 9-11. Under such circumstances, the issuance of the Report is mandated. Bushey Aff. at ¶ 11; Hughes Aff. at ¶ 12.

Accordingly, there is no First Amendment violation by Defendants Manor, Bushey, and Hughes.

## 2.  Defendant Glascock

Plaintiff alleges that Glascock retaliated against him by searching his cell on January 1, 2003, after Plaintiff informed the Superintendent on December 31, 2002, that he was experiencing retaliation. First of all, the Court is unaware how writing a letter to the Superintendent would constitute constitutionally protected conduct. Even if the Court construed the letter to be akin to a grievance, and even though the proximity of the letter to the search is close, Plaintiff cannot establish a causal connection. This is so because, similar to the December 28th search, Plaintiff's cell was randomly chosen by the computer and not picked by Glascock. Glascock Aff. Ex. A, Cell Search Form, dated Jan. 1, 2003.

Even if Plaintiff's cell number had not been randomly chosen by the computer, as stated previously, "inmates have no constitutional protection from cell searches, even those conducted for retaliatory reasons." *Hudson v. Palmer*, 468 U.S. at 530. Additionally, supposing that Plaintiff could establish that the writing of the letter was constitutionally protected conduct and that there

was a causal connection between the letter and the cellsearch, the searching of the cell would not constitute an adverse action as it would not deter similarly situated inmates from exercising their constitutional rights.  *See Salahuddin v. Mead*, 2002 WL 1968329, *5-6 (S.D.N.Y. Aug. 26, 2002). Thus, Plaintiff has failed to establish his burden against Glascock.

### 3.  Defendant Duquette

Plaintiff claims that on January 2, 2003, Duquette told Plaintiff that the searches would continue as long as he filed grievances.  The only grievance presented to this Court that was filed prior to the date of this incident was on December 2, 2002, against Manor, though apparently Plaintiff filed a grievance against Duquette <u>after</u> this alleged incident on January 7, 2003.  *See* Manor Aff., Ex. A, CORC Review, dated Feb. 4, 2003; Dkt. No. 97, Larry Duquette Aff., dated Aug. 28, 2006, Ex. B, CORC Review, dated Mar. 19, 2003;[21] *see also supra* Part I.  Although the proximity of the December 2nd grievance and the statement made on January 2nd may be relatively close, as it is approximately a month apart, Plaintiff has failed to establish his burden of showing a First Amendment violation by Duquette.  Even presuming that the grievance filed was the constitutionally protected conduct and that there was a causal connection between the grievance and the statement made, Plaintiff has provided no evidence of any adverse action taken by Duquette as his statement made to Plaintiff would not constitute an adverse action.  *See Islam v. Goord*, 2006 WL 2819651, at *5 (S.D.N.Y. Sept. 29, 2006) (finding that a threat to place the inmate in protective custody did not constitute an adverse action); *Bartley v. Collins*, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (holding that "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action") (citing *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir.

---

[21] The Court was not provided with a copy of the grievance filed against Duquette.

2001) for the proposition that "[n]ot every unnecessary statement of a prison guard regarding an inmate's exercise of free speech violates the First Amendment"); *Alicea v. Howell*, 387 F. Supp. 2d 227, 237 (W.D.N.Y.2005) (finding that a defendant's "alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim"); & *Cruz v. Hillman*, 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (stating that an allegation made by a defendant which "expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said 'Green Haven is an open battlefield, so be careful' insufficient to state a retaliation claim"); *see also Pledger v. Hudson*, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005) (holding that no adverse action was present even though the inmate alleged the defendant made threats of misbehavior reports and SHU confinement).  Thus, Plaintiff has failed to establish his burden against Duquette.

### 4.  Defendant Carey

Plaintiff alleges that Carey retaliated against him by forging a memorandum that allowed his staff to search Plaintiff's cell on December 9, 2002, when the memorandum actually gave permission to search the cell on December 8, 2002.  Although Plaintiff does not specifically state what constitutionally protected activity he was retaliated for, the Court will liberally construe Plaintiff's claim and presume Plaintiff is asserting that the retaliation was for the December 2, 2002 grievance.  *See* Compl. at ¶¶ 36 & 37; Pl.'s Mem. of Law.  Notwithstanding, Plaintiff cannot prove his claim.

First, Plaintiff asseverates that in its "undoctored" form, the memorandum gives his staff permission to search the SHU cells on December 8th, not December 9th.  Dkt. No. 102, Imhotep

H'Shaka Aff., dated Jan. 4, 2007, at ¶¶ 37 & 38.  However, the Exhibit Plaintiff provides to prove

his point does not have any date on the form.  *Id.*, Ex. H, Cell Search Form.  Even if a date did exist,

two portions of this Exhibit are blacked out, one of which may have contained a date.  *Id.*

Defendant Carey does provide the same Exhibit, this time without anything blacked out.  Dkt. No.

97, John Carey Aff., dated Aug. 21, 2006, at ¶ 9, Ex. A, Cell Search Form, dated Dec. 9, 2002.

Defendant's Exhibit shows a search date of December 9, 2002.  Plaintiff has put forth no evidence

that the document was altered.  Second, as previously noted, Plaintiff has "no constitutional

protection from cell searches, even those conducted for retaliatory reasons."  *Hudson v. Palmer*, 468

U.S. at 530.  Thus, Plaintiff has failed to meet his burden.

For all the reasons stated above, it is recommended that the Motion for Summary Judgement

be **granted** on the First Amendment claim.

### E.  Conspiracy Claim

Plaintiff alleges that: 1) Defendants Bushey and Hughes entered into a conspiracy by

searching and placing contraband in his cell after Manor told Bushey and Hughes to retaliate against

Plaintiff; 2) Defendant Duquette entered into a conspiracy with his officers to retaliate against

Plaintiff for filing grievances after Duquette made a statement that the searches would not stop so

long as the grievances were filed; 3) prior to issuing the disposition in his January 2nd Hearing,

Defendants Minogue and Manor entered into a conspiracy to retaliate against him for filing

grievances by imposing a restricted diet; and 4) Carey entered into a conspiracy with Manor to

retaliate against Plaintiff for filing grievances by searching his cell on December 9, 2002.  Compl. at

¶¶ 28, 32, 34, & 38.

42 U.S.C. § 1985(3) states that if two or more people conspire to deprive a person of equal

protection of the laws thereby injuring the person, then that party "may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."[22]  To recover under this section, a plaintiff must be able to show 1) a conspiracy; 2) meant to deprive a person or persons of equal protection of the laws or privileges and immunities under the laws; 3) "an overt act in furtherance of the conspiracy; and 4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (citations omitted).

The conspiracy need not be shown by an "explicit agreement" between the parties, but can be established through "the parties hav[ing] a tacit understanding to carry out the prohibited conduct." *Id.* (internal quotation marks and citations omitted).  If the allegations of a conspiracy to deprive a person of his constitutional rights are "conclusory, vague or general," then dismissal is proper. *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (quoting *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993)); *see also Webb v. Goord*, 340 F.3d 105, 111 (2d Cir. 2003).  In addition, the conspiracy must be "motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas v. Roach*, 165 F.3d at 146 (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993)).

In this case, Plaintiff has failed to state a cause of action under § 1985.  First of all, though

---

[22] 42 U.S.C. § 1985(3) states in pertinent part:

Depriving persons of rights or privileges. If two or more persons . . . conspire, . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, . . .; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

Plaintiff submits several Affidavits of inmates in regards to his conspiracy claims, many of those

Affidavits shed no light on a conspiracy between any of the Defendants apart from solitary

statements made by Manor.  *See* H'Shaka Aff., Exs. F, Brandon Holmes Aff., dated Dec. 17, 2002

& Bartram Yihni Dabney Aff., dated Jan. 1, 2003, & G, Mark Lawler Aff., dated Dec. 31, 2002.[23]

Plaintiff does submit two Affidavits whereby the inmates state they overheard Manor, Hughes, and

Bushey discussing Plaintiff's grievances and how to get him back; Defendants Minogue and Carey

were not mentioned.  *Id.*, Ex. G, Keith Hart Aff., dated Dec. 31, 2002, & Kenneth Degraffenriedt

Aff., dated Sept. 30, 2003.  Notwithstanding, Plaintiff has not pled that any of the alleged

conspiracies were motivated by some racial or class-based discriminatory animus.  *See id.*

Therefore, it is hereby recommended that the Motion for Summary Judgment be **granted** on

the 42 U.S.C. § 1985 claim.

### F. Personal Involvement

Plaintiff claims that Defendant Goord received a memorandum from Artus regarding his

medical issues but failed to investigate said issues, thus allowing him to receive a restricted diet.

---

[23] On February 16, 2007, Defendants filed a Motion to Strike Affidavits Offered by Plaintiff in Opposition to Defendants' Motion for Summary Judgment.  Dkt. No. 105.  Plaintiff opposes the Motion.  Dkt. No. 107.  Within this Motion, Defendants state that Plaintiff failed to engage in discovery in a good faith manner.  Dkt. No. 105, Defs.' Mem. of Law.  Specifically, Defendants claim that during the deposition of Plaintiff on July 21, 2004, Plaintiff was asked if there were any witnesses to the conspiracy or retaliation.  *Id.* at p. 1.  Plaintiff responded that there were three inmate witnesses, however, he was unable to name those inmate witnesses.  *Id.* at pp. 1-2.  After the deposition was completed and the transcript was forwarded to Plaintiff, no changes to the errata sheet were made.  *Id.* at p. 2.  Then in Plaintiff's opposition to the Motion for Summary Judgment, he submitted five inmate witness affidavits, the latest which was sworn to on September 30, 2003, nearly ten months prior to the date of the deposition.  *Id.*  Plaintiff claims Defendants never requested the documents during the discovery period and that during the deposition, he relied on his memory instead of his paperwork.  Dkt. No. 107, Pl.'s Aff., dated Feb. 24, 2004, at ¶¶ 2-6.  "Even in the absence of a discovery order, a court may impose sanctions for misconduct during discovery through this inherent power to manage its affairs."  *LaGrande v. Adecco*, 233 F.R.D. 253, 258 (N.D.N.Y. 2005) (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002)).  Nevertheless, the court should exercise such power "with restraint and upon the finding of bad faith and where abuse litigation practices are evident."  *Id.* (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998)).  Upon reviewing the papers submitted by Defendants and Plaintiff, the Court does not find such bad faith that abuse of litigation practices are evident.  Thus, as the imposition of sanctions is within the discretion of the Court, Defendants' Motion to Strike is **denied**.

Compl. at ¶ 17; Pl.'s Mem. of Law at pp. 10-11.  Plaintiff further alleges that on June 19, 2002,

Defendant Eagen denied his grievance.  Compl. at ¶¶ 17 & 18; Pl.'s Mem. of Law at pp. 10-11.

Goord and Eagen assert Plaintiff has failed to allege they were personally involved in any

constitutional violation.  Defs.' Mem. of Law at pp. 14-17.

The Second Circuit has held that "personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Wright v. Smith*,

21 F.3d 496, 501 (2d Cir. 1994) (citations omitted).  Moreover, "the doctrine of *respondeat superior*

cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement.

Therefore, a prison official may not be found liable for a constitutional violation merely because of

the acts of those under his control."  *Kinch v. Artuz*, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15,

1997) (emphasis in original) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995) & *Wright v.*

*Smith*, 21 F.3d at 501) (further citations omitted).  Additionally, "mere 'linkage in the prison chain

of command' is insufficient to implicate a state commissioner of corrections or a prison

superintendent in a § 1983 claim."  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting

*Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)); *see also Wright v. Smith*, 21 F.3d at 501

(defendant may not be held liable simply because he holds a high position of authority).

However, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of

the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional
> violation, 2) failure to remedy a wrong after being informed through a report or appeal,
> 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional
> violation, or allowing such a policy or custom to continue, 4) grossly negligent
> supervision of subordinates who committed a violation, or 5) failure to act on
> information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon v. Coughlin*, 58 F.3d at 873)

*-33-*

(further citations omitted).

Here, Plaintiff fails to allege that either Goord or Eagen was personally involved in any constitutional violation and Plaintiff does not assert any claim for supervisory liability against either individual.  Compl. at ¶¶ 17 & 18; Rock Aff., Ex. B, Pl.'s Dep. at p. 28, lines 21-25, & p. 29, lines 2-6; Pl.'s Mem. of Law at pp. 10-11.  As to Defendant Goord, it has been noted by Artus that DOCS policy requires the Commissioner to be notified of an inmate being placed on a restricted diet, but that this notification is purely procedural.  Defs.' Mem. of Law at p. 15; Artus Aff. at ¶ 7.  However, the Commissioner does not approve nor authorize a diet and has no personal role in the imposition of the restricted diet.  Defs.' Mem. of Law at p. 15; Artus Aff. at ¶ 7.  In regards to Plaintiff's claim that Goord did not investigate his claim, Plaintiff's restricted diet was implemented between May 8 through May 15, 2002.  Miller Aff. at ¶ 16.  Plaintiff did not file his grievance until May 24, 2002, after the restricted diet was completed.  Lucia Aff., Ex. A, Grievance, dated May 24, 2002.  Thus, it would have made no difference if an investigation was conducted since the restriction was clearly over by that time.  As for Eagen, Plaintiff has stated that Eagen's involvment amounts to the signing of the CORC determination of Plaintiff's grievance.  Rock Aff., Ex. B, Pl.'s Dep. at p. 28, lines 21-25, & p. 29, lines 2-6.  Eagen is a non-voting member of the CORC and did not vote on the outcome of Plaintiff's grievance.  Eagen Aff. at ¶¶ 10 & 11.  Eagen merely signs the CORC determinations to verify that it was a CORC decision.  *Id.* at ¶ 10 & 12.  The record is devoid of any evidence that Goord or Eagen was personally involved.

Therefore, it is recommended that the Motion for Summary Judgement be **granted** as to Defendants Goord and Eagen for lack of personal involvement.

### G.  Non-Service of Defendants Mitchell, Senkowski, and Bruce

As noted previously, Defendants Mitchell, Senkowski, and Bruce have not been properly served with process in this action.  *See supra* note 4.  Under Fed. R. Civ. P. 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period.  Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint.  Fed. R. Civ. P. 4(m).[24]  Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, dismissing the case without prejudice as to that defendant.  *Id.*

Here, Summonses were issued for Mitchell, Senkowski, and Bruce on August 13, 2003.  On November 10, 2003, all three Summonses were returned unexecuted.  *See* Dkt. Nos. 30, 34, & 35. On December 9, 2003, Plaintiff filed a letter requesting that service be attempted on any or all unserved defendants.  Dkt. No. 51, Lt.-Req., dated Dec. 9, 2003.  On December 17, 2003, this Court issued an Order notifying Plaintiff that he may re-submit USM-285 forms in order to attempt service and further advised Plaintiff that failure to serve any defendants may result in their dismissal from this action.  *Id.*  Then on February 11, 2004, Plaintiff filed a Motion to allow service of the Complaint on Defendants Senkowski and Mitchell through the State Attorney General's Office. Dkt. No. 53, Mot.  During the pendency of this Motion, another attempt to serve Defendant Bruce was made.  *See* Dkt. No. 57.  However, the attempt was unsuccessful and the Summons was returned unexecuted.  *Id.*  On May 13, 2004, the Motion to serve Senkowski and Mitchell through the State Attorney General' Office was denied by the Honorable Lawrence E. Kahn, United States

---

[24] Pursuant to the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days.  N.D.N.Y.L.R. 4.1(b).

District Judge.  Dkt. No. 64, Order, dated May 13, 2004.  No further attempts to serve these

Defendants was made.  Based upon the warning Plaintiff previously received that failure to serve the

Defendants may result in their dismissal of the action, the Court could recommend dismissal of

these three Defendants on that basis.

Notwithstanding, in accordance with 28 U.S.C. § 1915(e)(2), when a plaintiff proceeds with

an action IFP, a court shall dismiss the case **at any time** "if the court determines that . . . the action .

. . fails to state a claim on which relief may be granted[.]"  28 U.S.C. § 1915(e)(2)(B)(ii).  In this

Court's estimation, H'Shaka fails to state cognizable claims in his Complaint as to these three

Defendants.  Plaintiff claims that: 1) Defendant Mitchell was deliberately indifferent to his medical

needs in violation of the Eighth Amendment when he failed to cancel the restricted diet after

Plaintiff sent Mitchell a letter on May 9, 2002, reminding him that lactoid tablets made him feel

sick; 2) Defendant Senkowski was deliberately indifferent to his medical needs in violation of the

Eighth Amendment when he did not grant Plaintiff's appeal of his grievance asking not to placed on

the restricted diet nor did he respond to a letter sent to him on May 7, 2002, on the same issue; and

3) Defendant Bruce retaliated against him by searching his cell on December 9, 2002, in violation of

his First Amendment right and then entered into a conspiracy with Manor when he did not sign the

Misbehavior Report issued on December 9, 2002, at the request of Manor.  Compl. at ¶¶ 9, 15, 19-

20, & 24.

## 1.  Defendants Mitchell and Senkowski

Plaintiff's claims against Mitchell and Senkowski must fail.  First of all, as noted previously,

even if Plaintiff had a milk allergy, it would not constitute a serious illness under the Eighth

Amendment.  *See Porter v. Coombe*, 1999 WL 587896, at *3 (S.D.N.Y. Aug. 4, 1999); *see also*

*-36-*

*supra* Part II.B.  Therefore, Plaintiff cannot meet this threshold requirement.  Second, Plaintiff's

placement on the restricted diet, even if it were to contain one ingredient to which Plaintiff was

allergic, would not constitute an Eighth Amendment violation.  *See Smith v. Burge*, 2006 WL

2805242, at * 11 n. 78 (N.D.N.Y. Sept. 28, 2006) (citing, *inter alia*, *Porter v. Coombe,* 1999 WL

587896, at *1, 3 & n. 2 for the proposition that there was no Eighth Amendment violation when the

inmate was placed on restricted diet even though the plaintiff was allergic to two of the ingredients

in the restricted diet loaf); *see supra* Part II.B.  Furthermore, as to Senkowski, Plaintiff has failed to

allege that he was personally involved in any constitutional violation.  *See Wright v. Smith*, 21 F.3d

at 501; *see supra* Part II.E.  Merely affirming a determination or neglecting to respond to a letter

would not constitute personal involvement in a constitutional violation.  Moreover, Plaintiff did not

state a claim for supervisory liability against Senkowski.  *See* Compl. Accordingly, Plaintiff has not

established an Eighth Amendment violation against either Defendant and has failed to show

Senkowski was personally involved.

## 2.  Defendant Bruce

As for Bruce, Plaintiff has failed to make out both the First Amendment and conspiracy

claims.  In regards to the First Amendment retaliation claim, Plaintiff states that Bruce retaliated

against him by searching his cell on December 9, 2002.  Once again, Plaintiff does not state the

constitutionally protected activity in which he engaged prior to the search.  *See* Comp.

Nevertheless, even presuming Plaintiff was referring to the December 2, 2002 grievance filed

against Manor, Plaintiff would still have no claim as Plaintiff has "no constitutional protection from

cell searches, even those conducted for retaliatory reasons."  *Hudson v. Palmer*, 468 U.S. at 530; *see*

*also* Manor Aff., Ex. A, CORC Review, dated Feb. 4, 2003.  Furthermore, a cell search is not

considered to be an adverse action.  *See Salahuddin v. Mead*, 2002 WL 1968329, *5-6 (S.D.N.Y.

Aug. 26, 2002).  Thus, Plaintiff cannot establish his burden on the First Amendment claim.  In terms

of the conspiracy claim, Plaintiff asserts that Bruce entered into a conspiracy with Manor when he

did not sign the Misbehavior Report issued on December 9, 2002, at the request of Manor.

However, as noted previously, Plaintiff has failed to plead that the conspiracy which may have

occurred between Bruce and Manor was motivated by some racial or class-based discriminatory

animus.  *See Thomas v. Roach*, 165 F.3d at 146.  Thus, the conspiracy claim cannot hold.

Accordingly, the Court recommends **dismissal** of Defendants Mitchell, Senkowski, and

Bruce pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim.

## III.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Motion for Summary Judgment (Dkt. No. 97) be **GRANTED**;

and it is further

**RECOMMENDED**, that the Complaint (Dkt. No. 1) be **DISMISSED** as to Defendants

Mitchell, Senkowski, and Bruce in accordance with 28 U.S.C. § 1915(e)(2)(B)(ii) as failing to state

any cognizable claim; and it is further

**RECOMMENDED**, that the Motion to Strike Affidavits Offered by Plaintiff in Opposition

to Defendants' Motion for Summary Judgment (Dkt. No. 105) be **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and

Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written

objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

*-38-*

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE**

**APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y*

*of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R.

CIV. P. 72, 6(a), & 6(e).


Date:   March 6, 2007
        Albany, New York

_____
RANDOLPH F. TREECE
United States Magistrate Judge